UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

BRENDA L. BROOKS,

        Plaintiff,

v.

Case Number 06-14939-BC
Honorable Thomas L. Ludington

LIEUTENANT DAVID ROTHE,
POLICE CHIEF JOHN BODIS, CITY
OF BAD AXE, ASSISTANT PROSECUTING
ATTORNEY ELIZABETH V. WEISENBACH,
PROSECUTOR MARK J. GAERTNER,
COUNTY OF HURON,

        Defendants.
_____/

**ORDER DENYING IN PART DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT AND DIRECTING SUPPLEMENTAL BRIEFING**

On May 8, 2006, Plaintiff Brenda Brooks worked as the employee of a domestic violence shelter. She twice refused to let a police officer on the premises, which resulted in her arrest on two counts of resisting and obstructing an officer under state law. Those charges were withdrawn that same day, but she now brings the instant case. Plaintiff has filed suit against several defendants, alleging state law causes of action for assault and battery, false arrest, false imprisonment, gross negligence, vicarious liability and violation of 42 U.S.C. § 1983 for violations of her, *inter alia*, Fourth Amendment rights. Defendants subsequently filed two distinct motions for summary judgment under Federal Rule of Civil Procedure 56.

I.

The parties' filings do not identify any disagreement over genuine issues of material fact. The following factual recitation relies primarily on Plaintiff's deposition and the police report of the

events at issue, written that same day.

On May 8, 2006, Plaintiff was working as a shift worker at a shelter for domestic violence victims. She had received training on the shelter policies, which included a specific policy for responding to legal and law enforcement inquiries. That policy begins by stating, "the [shelter] will maintain [resident's[1]] confidentiality at all times unless a legal exception exists." *SafeHouse Policies*, Pl. Rs. to Dft. Rothe, Bodis, and City of Bad Axe's Mot. for S. Jgmt., Ex. 5 [dkt #25-6]. The policy guides employees with respect to law enforcement searches, providing as follows:

> **Search Warrants** are a normal investigative method of choice in situations where local police or the prosecutor perceive that the prior notice provided by a subpoena or investigatory demand may result in the destruction of evidence or the flight of a wanted person.
> All searches must be conducted upon the authority of a search warrant. In order to satisfy the fourth amendment [*sic*] requirements, a search warrant must be based upon probable cause and describe the place to be searched and the items to be seized with reasonable precision.

*Id*. The manual does not address the circumstance where law enforcement might proceed with a search without obtaining a search warrant. The standards of the policy, for the most part, permit only the shelter director – and not its staff – to take actions that could implicate residents' confidentiality.

Around 4:30 a.m., according to her deposition, Plaintiff observed one of the residents having difficulty walking and talking. She believed that the person might need immediate medical attention, but, pursuant to shelter policy, she sought to have the resident make the decision to seek medical care. The resident initially declined[2] but, after Plaintiff asserted her view that the woman

---

[1]The shelter uses the term "service participant" to describe the residents of the facility.

[2]Plaintiff then contacted her operations manager, Amy Kain, to inquire how to handle the situation. Her manager directed her to inquire again with the resident, because the shelter's policy

-2-

might require attention, the resident agreed. Plaintiff then called 911 at approximately 7:11 a.m.

After Plaintiff placed that call, Defendant Lieutenant David Rothe of the Bad Axe City Police Department came to the door. He identified himself as a first responder, although Plaintiff states that she did not see a badge. They spoke through the intercom, and she could see him via a camera. Plaintiff states that she was not sure he was a police officer. (Around 2:30 a.m. that same day, Plaintiff made a phone call for a pregnant woman who went to the hospital by ambulance. That woman's husband allegedly appeared at the shelter and identified himself as a first responder, and that man later visited the hospital.) Defendant Rothe requested access to the building. Plaintiff refused, and Defendant Rothe left in a manner that seemed angry to Plaintiff.

Shortly thereafter, once the ambulance had arrived, Plaintiff contacted her manager by telephone again to get permission to copy the resident's medical release for the paramedics. The manager gave permission to copy that release. Plaintiff did not tell her about her contact with Defendant Rothe. While Plaintiff was preparing the release documents, Defendant Elizabeth Weisenbach contacted the shelter by telephone and spoke to Plaintiff. Defendant Weisenbach identified herself as an assistant county prosecutor and a member of the shelter's board. Defendant Weisenbach inquired why Plaintiff denied entry to Defendant Rothe. Plaintiff declined to give her any information, and she described her circumstance and the need to attend to an emergency situation. According to Plaintiff, Defendant Weisenbach responded by screaming about Plaintiff's incompetence, threatening her job, and indicating that Plaintiff would hear more from her.

The paramedics then took the resident to the hospital. Next, the roommate of that resident told Plaintiff that she saw the resident take three pills. Plaintiff then sought to attend to other

---

was for the residents to make independent decisions.

residents, some of whom were concerned about the presence of outsiders on the premises.

At approximately 7:50 a.m., the manager called Plaintiff to ask her to stay until 9 a.m. (to permit that manager to attend her parents' doctor's appointment). Plaintiff related the conversation with Defendant Weisenbach to her manager, who instructed Plaintiff not to worry and assured her that she would address Defendant Weisenbach when she arrived.

Shortly thereafter, a man and a woman came to the door of the shelter. Plaintiff was the only staffer on the premises at that point. She recognized Defendant Rothe from earlier that morning but could not identify the woman by sight. When Plaintiff opened the door, the woman screamed that she was Defendant Weisenbach, the assistant prosecutor on the board, demanded to know the circumstances, insisted that she and Defendant Rothe be allowed to enter, and stated that the crime scene required investigation. Plaintiff apologized and declined to give any information, pursuant to the training she received as a shelter employee. Defendant Rothe informed Plaintiff several times that he needed to investigate a crime scene and that she would be arrested if she did not allow him to enter. He stated that he was a police officer, but he did not show a badge. Plaintiff asked several times if she could call her manager (who, pursuant to shelter policy, did have the authority to permit a police officer to enter). Defendants Weisenbach and Rothe did not allow her to make that call.

Plaintiff claims that she did not touch either of them as she attempted to keep them from entering. Plaintiff believes that Defendant Weisenbach pushed the door open, although Plaintiff was using a hand and foot to keep the door closed. Plaintiff was forced to step back, and Defendant Weisenbach then placed both her hands on Plaintiff's shoulders and pushed her further back. Defendant Weisenbach continued to insist that Plaintiff tell them about what was going on and identify the residents, and she threatened Plaintiff with jail. Plaintiff still declined, and they still did

not let her call her manager. Defendant Rothe stepped in and out of the building several times for phone calls. Eventually, Defendant Rothe arrested Plaintiff, after Defendant Weisenbach told him several times to arrest her. Defendant Rothe removed a necklace with keys on it from around Plaintiff's neck. She was handcuffed, taken to the police station, booked, and placed in a holding cell. She alleges no physical injury.

While these events were unfolding, information about the situation filtered through the police department and then through the prosecutor's office. After Defendant Rothe left the shelter from his first encounter with Plaintiff, he contacted Defendant Weisenbach. Defendant Rothe then advised Defendant John Bodis, chief of police, of the situation. Defendant Bodis then contacted the 911 dispatch supervisor (his wife) and learned that the paramedics believed that the resident had suffered a drug overdose, rather than a back injury.

Defendant Bodis then contacted the Huron County prosecutor, Defendant Mark Gaertner, to advise him of the situation and, in particular, of Plaintiff's refusal to provide any information. They agreed that, in light of the possible drug overdose, an investigation was necessary. They also agreed that Defendant Bodis would contact the president of the board of directors at the shelter, Huron County Commissioner Michael Gage.

The conversation between Defendant Bodis and the shelter's president touched on prior difficulties involving police intervention at the site, apparently including denial of access for arrests and subpoenas. The shelter's president assured him that he believed that these issues had been resolved by the shelter's policies, that he would look into the situation, and that the board would discuss the incident at its meeting three days later.

Thereafter, Defendant Bodis again spoke to Defendant Gaertner. They concluded that an immediate investigation of the possible drug overdose was appropriate. When Defendant Weisenbach arrived, she was further apprised of the situation. She and Defendant Rothe left for the shelter.

After they arrived there, Defendant Rothe contacted Defendant Bodis to advise that they were again denied access. Defendant Bodis then contacted Defendant Gaertner. They concluded that Plaintiff should be arrested for resisting and obstructing the investigation.

After Plaintiff was arrested and later placed in a holding cell, she was released on bond. She was charged with two felony counts of resisting and obstructing under Mich. Comp. Laws § 750.81d(1). That same day, Defendant Gaertner filed a motion of nolle prosequi, and a judge granted it two days later.

On November 2, 2006, Plaintiff filed suit, alleging many claims. She alleges assault and battery against the individual defendants (count I), based, in part, on the contact at the door and placing her in handcuffs. She also alleges false arrest against the individual defendants (count II), due to her contention that they had no basis for arresting her. She next asserts false imprisonment against the individual defendants (count III), based on her detention during her arrest and in jail that day. She further claims gross negligence against the individual defendants (count IV) and asserts that Defendant City of Bad Axe (city) and Defendant Huron County (county) are vicariously liable for the conduct of the individual defendants (count V). Plaintiff, however, provides little legal basis for identifying these counts as distinct causes of action, which she apparently seeks to treat separately from exceptions to the state law immunity statute, Mich. Comp. Laws § 691.1407. Finally, she claims a violation of 42 U.S.C. § 1983 for violations of her First, Fourth, Fifth, and

Fourteenth Amendment rights against all defendants (counts VI and VII).[3] Plaintiff's complaint identifies conduct that addresses protection against illegal search or seizure, but the complaint does not offer clarification about how rights of free speech, due process, equal protection might be implicated. On June 13, 2007, Defendants Rothe, Bodis, and city (Defendant police) filed a motion for summary judgment under Federal Rule of Civil Procedure 56, and on August 22, 2007, Defendants Weisenbach, Gaertner, and county (Defendant prosecutors) filed a motion for summary judgment under the same rule, and, putatively, under Federal Rule of Civil Procedure 12(b). On September 24, 2007, the Court held a hearing on those two motions.

II.

Under Federal Rule of Civil Procedure 56(c), a court must review "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to conclude that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-252 (1986). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002). The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which

---

[3] In one of her responses to the instant motions for summary judgment, Plaintiff withdrew the claim of vicarious liability and the aspects of the § 1983 claim that turned on violations of the Michigan constitution.

demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002).

III.

A.

To show a violation of 42 U.S.C. § 1983, a plaintiff must show that a defendant acted under color of state law and that the offending conduct deprived her of rights secured by federal law. *Mezibov v. Allen*, 411 F.3d 712, 717 (6th Cir. 2005) (citation omitted).

Defendants assert qualified immunity from Plaintiff's constitutional claims. Defendants focus their argument against Plaintiff's claim of a Fourth Amendment[4] violation based on the legality of her arrest. They contend that the arrest occurred lawfully, in light of their assertion that the facts supported arresting Plaintiff for resisting and obstructing a law enforcement officer.

"Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation." *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). The privilege serves the purpose of – early in litigation – preventing suits from progressing because qualified immunity is *immunity* from suit, not merely a defense to liability. *See id*. at 200-201.

The qualified immunity analysis unfolds in two steps. First, the court must inquire whether, "in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right." *Id*. at 201. Second, if a constitutional violation has

---

[4]Plaintiff advances claims of § 1983 violations based on the First, Fourth, Fifth, and Fourteenth Amendments. Regardless of whether Plaintiff's allegations could support claims of violations of the First, Fifth, or Fourteenth Amendments, Defendants have not sought summary judgment on those grounds.

occurred, "the court then determines whether the constitutional right that was violated was 'clearly established' at the time of the violation." *Id.* Ultimately, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. Once raised, the plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity. *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2001) (citation omitted).

Concerning Plaintiff's Fourth Amendment claim, she cannot proceed on a theory of excessive force. Although some of Plaintiff's allegations might appear to suggest that she seeks to pursue a claim based on excessive force, she concedes that claim in her responses. She characterizes an excessive force claim as a "straw man," which is consistent with the fact that, in her deposition, Plaintiff admits that she was not injured in any way. Accordingly, the Court concludes that Plaintiff does not and cannot advance a claim of a violation of her Fourth Amendment rights, based on excessive force. *See Lyons v. City of Xenia*, 417 F.3d 565, 575-576 (6th Cir. 2005) (requiring some allegation of physical injury to reach a jury).

The central focus of Defendants' arguments, however, against Plaintiff's assertion of a Fourth Amendment violation under § 1983 is that Defendant Rothe had probable cause to arrest Plaintiff for the state law offense of resisting and obstructing. Mich. Comp. Laws § 750.81d(1) prohbits that conduct as follows,"[A]n individual who assaults, batters, wounds, resists, obstructs, opposes, or endangers a person who the individual knows or has reason to know is performing his or her duties is guilty of a felony . . . ." "Obstruction" is defined to include "the use or threatened use of physical interference or force or a knowing failure to comply with a lawful command." Mich. Comp. Laws § 750.81d(7)(a). As construed by a panel of the Michigan Court of Appeals, this

statute does not require a showing of the lawfulness of arrest, which prevents a citizen from using force to resist an arrest she believes is unlawful. *People v. Ventura*, 686 N.W.2d 748, 751 (Mich. Ct. App. 2004). Notably, this decision departs from a long-standing interpretation of the statute.

Plaintiff asserts that her cause of action is grounded on her assertion that Defendants Rothe and Weisenbach did not have legal authority to demand to enter and to search the shelter. This basis differs from the distinct question of her subsequent refusal to comply with the order to permit that entry and search. *See Bourgeois v. Strawn*, 452 F.Supp. 2d 696, 709-710 (E.D. Mich. 2006) (describing as "disturbing" the proposition that "police can manufacture grounds to arrest a person innocent of wrongdoing simpl[y] by telling him to leave his own home without any lawful authority to do so and then arresting him for violating that directive"). Even the panel in *Ventura*, however, emphasized the importance of reviewing the constitutionality of such a demand after the fact. *Ventura*, 686 N.W.2d at 752 ("Solid mechanisms are in place . . . to correct any injustices that may result from an illegal arrest."). Defendants' contention that Plaintiff's arrest comports with Michigan's interpretation of its resisting and obstructing statute simply does not address Plaintiff's allegations.

Defendants further suggest that their demand for entry into and search on the premises of the shelter was justified by an exigent circumstance. In particular, they allude to the possible need to investigate a crime scene. Their briefing, however, provides minimal factual basis for asserting that an exigent circumstance existed, or that some other basis for overcoming the Fourth Amendment's requirement of a warrant for a search applies here. Accordingly, the Court will order supplemental briefing on that point.

Additionally, for Plaintiff to assert a claim based on a Fourth Amendment violation, premised on Defendants Rothe and Weisenbach's entry and search of the shelter property, Plaintiff must have standing. Plaintiff's pleadings do not directly establish that she has standing to assert such a violation on that basis. In *Minnesota v. Olson*, 495 U.S. 91, 95 (1990), the Supreme Court held that a person's ability to assert a Fourth Amendment right to bar a government agent's entry onto the premises on "whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." (Citing *Katz v. United States*, 389 U.S. 347 (1967); *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)). Whether or not the shelter's residents had a legitimate expectation of privacy in the shelter is less than clear. Plaintiff was not a resident of the shelter. Yet she was an employee of the shelter who acted, apparently, according to the policies set forth by her employer.[5] Under some circumstances, employees can assert a privacy interest in their own workplace. *See O'Connor v. Ortega*, 480 U.S. 709 (1987). Also, entities other than individual persons, such as corporations, have some Fourth Amendment rights, and such entities must assert those rights through their agents. *See General Motors Leasing Corp. v. United States*, 429 U.S. 338 (1977).

To date, the parties have not addressed any legal basis on which Plaintiff might have had standing to advance a Fourth Amendment claim based on Defendants Rothe and Weisenbach's entry onto the premises. Accordingly, the Court will order supplemental briefing for the parties to discuss what standing, if any, Plaintiff might have to assert a violation of her rights under the Fourth Amendment, based on Defendants' Rothe and Weisenbach's entry into the shelter.

---

[5]Notably, the shelter is not a plaintiff in this case, nor, on the other hand, has it been joined as a defendant.

The Court will not take up Plaintiff's state law claims of false arrest, false imprisonment, and assault and battery at this juncture. Those claims, which include either the existence of probable cause or lawfulness of contact as an element, are necessarily affected by the analysis outlined above. Those claims, along with any issue pertinent to the exercise of supplemental jurisdiction under 28 U.S.C. § 1367, will be addressed after the parties complete their supplemental briefing.

B.

Defendant prosecutors invite the Court to dismiss the claims against them on the basis of absolute prosecutorial immunity. The lead case on which Defendant prosecutors rely, *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976), does hold that a prosecutor has absolute immunity for activities that are integral to the judicial process. These activities include initiating a case, pursuing criminal prosecution, and presenting a case at trial. The Supreme Court, however, expressly noted that it did not rule on the scope of "immunity for those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate." *Id*. at 430-431. Defendant prosecutors further direct the Court toward the Sixth Circuit's decision in *Cooper v. Parrish*, 203 F.3d 937, 947 (6th Cir. 2000), which stated that, "[A] prosecutor who 'performs the investigative functions normally performed by a detective or police officer' such as 'searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested' is entitled only at most to qualified immunity." (Quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993)). Defendant prosecutors do, correctly, note that a prosecutor bears the burden of establishing entitlement to absolute immunity. *Lomaz v. Hennosy*, 151 F.3d 493, 497 (6th Cir. 1988) (citation omitted).

Significantly, Defendant prosecutors do not alert the Court to the Supreme Court's decision in *Burns v. Reed*, 500 U.S. 478, 495-496 (1991). There, the Court held that prosecutors have – at most – qualified and not absolute immunity for giving advice to police officers. The Court described that activity as not intimately associated with the judicial process. Thus, Defendant prosecutors both do not provide a legal basis for their assertion of prosecutorial immunity in the cases that they do cite, and they neglect to refer to Supreme Court precedent directly on point and adverse to their position. Absent a legal justification, Defendant prosecutors have not carried their burden to establish absolute immunity. The Court is, consequently, unpersuaded that prosecutorial immunity protects them here.

C.

As to municipal liability against Defendant city and Defendant county, "a municipality cannot be held liable under § 1983 for an injury inflicted solely by its employees or agents." *Gregory v. Shelby County*, 220 F.3d 433, 441 (6th Cir. 2000) (citation omitted). Generally, to establish liability against a governmental entity under § 1983, a plaintiff must show that an unconstitutional action follows from a policy, regulation, or decision officially adopted by that government entity. *Monell v. Dep't of Social Services*, 436 U.S. 658, 691 (1978); *see also Scarbrough*, *Scarbrough v. Morgan County Bd. of Education*, 470 F.3d 250, 261 (6th Cir. 2006) (citation omitted). Alternatively, a plaintiff can show that a constitutional deprivation occurred pursuant to a "custom" of a governmental entity, even if not formally enacted." *Monell*, 436 U.S. at 690-691. "Only then can the action of the municipality itself . . . be said to have caused the harm," rather than imputing to a government entity the bad acts of individual employees. *Shameizadeh v. Cunigan*, 336 F.3d 535, 556 (6th Cir. 2003) (citation and internal quotations

omitted). Although inadequate training might also suffice to establish the liability of a municipality, the failure in training must result from "deliberate indifference." *Id*. at 557.

Most important for this case, however, is *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986). There, the Supreme Court held that "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Id*. at 480. That is, if a person responsible for making final decisions sets direction for a municipal entity, even if only in one instance that is not repeated, the municipal entity can be liable for the consequence of that decision. *Id*. at 480-481. Here, the uncontested facts show that final decision makers, the chief of police and the county prosecutor, Defendants Bodis and Gaertner, reached a decision and then directed its execution. Based on the police report, Defendant Bodis consulted with Defendant Gaertner, who advised that Defendant Rothe enter the shelter and arrest Plaintiff. Consequently, under *Pembaur*, Defendants city and county can be held liable for the consequences of their decision makers' directive. Thus, the claim against Defendant city and Defendant county remains.

IV.

Accordingly, it is **ORDERED** that Defendant police and Defendant prosecutors' motions for summary judgment [dkt ## 21, 29] are **DENIED IN PART**, to the extent that either motion relies on Plaintiff's arrest for resisting and obstructing or on an assertion of absolute prosecutorial immunity.

It is further **ORDERED** that the parties shall provide supplemental briefing, on or before **November 14, 2007**, regarding the following issues: (1) the legal basis for Plaintiff's standing, if any, for asserting a violation of her rights under the Fourth Amendment based on Defendant Rothe

and Weisenbach's entry into the shelter; and (2) the factual basis for probable cause, if any, for an entry into the shelter to investigate a resident's purported drug overdose.

s/Thomas L. Ludington<br>
THOMAS L. LUDINGTON<br>
United States District Judge

Dated: October 31, 2007

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 31, 2007.

s/Tracy A. Jacobs
TRACY A. JACOBS

---